UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SHAND NASH,

Plaintiff,

v.

C.O. ROBERT KRESSMAN, WESTCHESTER COUNTY, WESTCHESTER COUNTY HEALTH CARE CORPORATION, KEVIN CHEVERKO, ROBERT DOTY, SGT. JAMES CONWAY, SGT. RICHARD MACCABEE, SGT. GREGORY BELL, SGT. JEFFREY CAMERA, SGT. ALVIN ROGERS, C.O. HUGH RENNALLS, C.O. MICHAEL SIMMONS, C.O. TERENCE GILMORE, C.O. JAIME ALDARONDO, C.O. MARTINEZ, C.O. BRUGGER, MARIE SUSSMAN, N.P., JUNE YOZZO AND GAIL BAILEY-WALLACE, M.D.,

Defendants.
-------------------------------------------------------------------x

11-cv-7327 (LTS) (RLE)

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff SHAND NASH, by and through his attorney Michael A. Deem, Esq., states as follows:

## PRELIMINARY STATEMENT

1. This is a civil rights action. The claims arise from a custom and practice of depriving inmates[1] in custody of the Westchester County Jail ("WCJ") their constitutional rights to: 1) be free from use of excessive force; and 2) adequate medical care. The U.S. Department of Justice ("DOJ") found the existence of such a custom and practice during an investigation pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"). Specifically, correction officers of the WCJ used excessive force against plaintiff on two occasions causing injury to his

---

[1] "Inmates" refers to both pre-trial detainees and sentenced prisoners.

left eye. Medical care was not provided to address plaintiff's injuries resulting in total blindness in that eye and degeneration of his right eye.

2. Plaintiff seeks declaratory judgment, injunctive relief, presumed damages, compensatory damages, punitive damages against the non-municipal defendants, an award of attorneys' fees, costs and disbursements, and such other and further relief as the Court deems just and proper.

**JURISDICTION**

3. This action is brought pursuant to 28 U.S.C. §§1331 and 1343, 42 U.S.C. §1983, and the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the U.S. Constitution.

4. Venue is laid within the U.S. District Court for the Southern District of New York in that a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

**PARTIES**

5. Plaintiff SHAND NASH was at all times relevant a member of a racial minority group ("Black"), a resident of the State of New York and detainee or prisoner in custody of the WCJ.

6. Defendant KEVIN CHEVERKO, was at all times relevant employed by Westchester County as a Deputy Commissioner of the Westchester County Department of Correction ("DOC"). He is sued individually.

7. Defendant ROBERT DOTY, was at all times relevant employed by Westchester County as an Assistant Warden of the WCJ, a division of the DOC. He is sued individually.

8. Defendants C.O. ROBERT KRESSMAN, SGT. GREGORY BELL, SGT. JEFFREY CAMERA, C.O. HUGH RENNALLS, SGT. ALVIN ROGERS, C.O. MICHAEL

SIMMONS, C.O. JAIME ALDARONDO, C.O. TERENCE GILMORE, C.O. MARTINEZ and C.O. BRUGGER were at all times relevant, employed by Westchester County as correction officers in the WCJ. They are sued individually.

9.      Defendant WESTCHESTER COUNTY, was at all times relevant, a municipal corporate subdivision of the State of New York, responsible for the policies, practices, and customs of the DOC and WCJ.

10.      Defendant WESTCHESTER COUNTY HEALTH CARE CORPORATION ("WCHCC"), was at all times relevant, a public benefit corporation duly existing by reason of and pursuant to the laws of the State of New York.

11.      Defendants SGT. JAMES CONWAY and SGT. RICHARD MACCABEE, were at all times relevant, employed by Westchester County as supervisory correction officers in the WCJ. Sgt. Maccabee was at all times relevant the on-scene supervisor of the WCJ, Emergency Response Team ("ERT"). They are sued individually.

12.      Defendant MARIE SUSSMAN, N.P., was at all times relevant, employed by WCHCC as a Nurse Practitioner, for the provision of medical care to inmates in the WCJ. She is sued individually and as a state actor.

13.      Defendant JUNE YOZZO, was at all times relevant, employed by Westchester County as the Medical Contract Monitor, responsible for overseeing the provision of medical care to inmates in the WCJ. She is sued individually and as a state actor.

14.      Defendant GAIL BAILEY-WALLACE, M.D., was at all times relevant, employed as the Medical Director, WCJ. She is sued individually and as a state actor.

## FACTS

**WCJ's History of Accreditation**

15.     In 1997, the WCJ was accredited by the National Commission on Correctional Health Care ("NCCHC"). As a result of NCCHC's accreditation Westchester County has received reduced insurance premiums for activities pertaining to the WCJ.

16.     In January 2009, the WCJ was accredited by the American Correctional Association ("ACA"). As a result of ACA's accreditation Westchester County has received reduced insurance premiums for activities pertaining to the WCJ.

17.     In December 2009, the WCJ was reaccredited by the NCCHC.

18.     On information and belief, the DOC did not inform NCCHC and ACA officials or accreditation teams of the true conditions of confinement for inmates in custody of the WCJ, because accreditation and reaccreditation would have been denied. Specifically, DOC did not inform said officials or teams of the incidents referred to in DOJ's investigation or the notices of claim and complaints referenced, *infra*.

**DOJ Finds That the WCJ Fails to Protect Inmates From Harm**

19.     On August 30, 2007, DOJ notified Westchester County of its intent to conduct an investigation of the WCJ pursuant to CRIPA.

20.     From February 25-28, 2008, DOJ conducted an on-site inspection at the WCJ with expert consultants in corrections and custodial medical care. DOJ conveyed preliminary findings to senior Westchester County officials and legal counsel at the close of the site visit. The consultants also provided on-site recommendations.

21.     Joseph Spano, Commissioner, DOC; Anthony Amicucci, Warden, WCJ; Dr. Bailey-Wallace and others were advised of DOJ's preliminary findings and on-site recommendations, at the conclusion of the on-site inspection, February 28, 2008.

22.     On information and belief, the preliminary findings were in sum and substance the same as those contained in DOJ's Findings Letter, published on November 30, 2009.

23.     The Findings Letter expressly provides, in part:

> III. Findings. We found that [WDOC] has a pattern of failing to: (1) adequately protect inmates from harm and serious risk of harm from staff; and (2) provide inmates with adequate medical and mental health care. These deficiencies violate [WDOC] inmates' constitutional rights. Ex. A, p. 7.
>
> A.  1. We found evidence of a pattern and practice of use of excessive force by the [ERT]. Ex. A, p. 7.
>
> However, as detailed below, our review of videotaped use of force incidents reflect a pattern and practice in which the ERT uses excessive force against inmates. In the video reviewed, ERT officers are seen shoving inmates aggressively into fixed objects when less injurious tactical holds could be safely employed. The officers are seen routinely applying needlessly painful escort techniques (bent wrist locks while apparently applying intense pressure). The officers are also seen routinely employing crowd control contaminants (MK-9 in a 16 ounce canister) when they are tactically contraindicated rather than utilizing an equally effective personal size canister (MK-4 in a three ounce canister). Also troubling is the fact that the ERT officers often seem to disregard some inmates' mental impairments in use of force incidents, which appears to greatly heighten the volatility of a given situation. Indeed, they utilize threatening and aggressive verbal strategies, which tend to escalate rather than de-escalate a potentially volatile situation. Ex. A, p. 8.
>
> In arriving at our findings, we reviewed hundreds of WCJ use of force incidents from 2006-2007, dozens of which were captured on videotape. This review revealed a failed administrative review process at WCJ and a pattern and practice of the ERT to engage in needlessly aggressive and injurious force against inmates. We are concerned both about the nature and severity of the force used by the ERT, and the paucity of the subsequent investigations, particularly where the evidence clearly indicates that supervisory review and/or investigations were warranted. Ex. A, p. 8.

B. [T]here are some areas where the medical care provided at [WDOC] falls below the constitutionally required standards of care. Specifically, we found the following deficiencies: … an inadequate medical grievance process. Ex. A, p. 19.

2. We found that WCJ inadequately reviews use of force incidents to prevent a pattern of use of excessive force against inmates. As a result, staff who subject inmates to excessive force are not adequately identified, nor are appropriate remedial measures taken. Ex. A, p. 13.

Our review of numerous use of force incidents indicated that WCJ's Use of Force Standard Operating Procedures ("SOP") concerning administrative review of use of force incidents was not followed. Ex. A, p. 13.

Failure to review uses of force effectively provides Jail Staff with unfettered use of force. As a result, WCJ is unable to adequately protect its inmates from harm. Ex. A, p. 14.

Indeed, in 2007, only two investigations of use of force incidents were completed by jail security administrators. Neither of these investigators were initiated by WCJ officials….Further, we were concerned about the adequacy of these two investigations. One of the two investigations appears to be simply a cursory review of the detainee's complaint. The second investigation failed to address or investigate a questionable use of crowd control contaminant. Ex. A, p. 14.

3. Medical Grievance Process. Although [WDOC] has instituted a policy for submitting grievances, it is not consistently implemented or effectively publicized. According to the grievance Mechanism, CHS-A-11, inmate complaints must be written on an inmate grievance Form and submitted to [WDOC] staff. During our on-site visit, however, many of the corrections officers in [WDOC]'s housing units did not have Grievance Forms available for inmates if requested. Further, when inmates and jail staff were asked where an inmate could get a form to file a grievance, both the inmates and jail staff provided inconsistent responses. Ex. A, p. 23.

Because inmates have no alternative options for health care other than the services provided them at [WDOC], it is important for inmates to have access to a medical grievance process. If an inmate perceives that his or her serious health needs are being unmet, the grievance process provides a mechanism to investigate the legitimacy of that concern. In order to be effective, however, a grievance policy must [be] made clear to prison staff and inmates. As noted above, [WDOC] staff and inmates are not aware of the procedures for filing a grievance, and inmates are unable to obtain grievance forms on their housing units. Without consistent access to grievance forms for inmates, the medical grievance process cannot operate as required. Ex. A, p. 23.

> IV. Remedial Measures. In order to address the constitutional deficiencies identified above and protect the constitutional rights of detainees, the [WDOC] should implement, at a minimum, the following measures in accordance with generally accepted professional standards of correctional practice: Ex. A, p. 31.
>
> B. Medical Care. 4. Access to Health Care. a. Ensure inmates have adequate access to health care. b. Ensure that the medical request process for inmates is adequate and provides inmates with adequate access to medical care. This process should include logging, tracking, and timely responses by medical staff. Ex. A, p. 38.

24.     On November 30, 2009, Mr. Perez and Preet Bharara, U.S. Attorney, SDNY, published the Findings Letter. *See* Ex. 1. (Incorporated by reference) Copies of the letter were delivered that day to the Westchester County Executive, the Commissioner of DOC, and the Westchester County Attorney.

**Allegations of Denial of Medical Care by Other Inmates in Custody of the WCJ**

25.     Since at least January 1, 2006, Westchester County entered into a contract with WCHCC for the provision of comprehensive healthcare services for inmates in custody of the WCJ. Said contract was extended on May 6, 2008 and terminated on July 25, 2010.

26.     On March 4, 2008, Eric Price filed a notice of claim alleging that he was denied medical care for a dislocated shoulder for two months.

27.     On March 18, 2008, Maximo Rosa filed a notice of claim alleging that he was denied medical care for MRSA.

28.     On April 8, 2008, Michael Lanza filed a notice of claim alleging that he was denied medical care for a broken arm, resulting in the arm having to be re-set and causing his fingers to swell and turn black.

29.     On May 3, 2008, Barbara Glover filed a notice of claim alleging that she was denied medical care for severe chest pains, fever and chills. She was transferred to state custody the next day, diagnosed with pneumonia and hospitalized for 10 days.

30.     On July 3, 2008, Heather Hyland filed a notice of claim alleging that she was denied pain medication for an underlying condition which was being treated by a prior medical provider, but she still suffered from the underlying medical condition.

31.     On August 1, 2008, Derek Willis filed a notice of claim alleging that he suffered a slip and fall in a shower, the right side of his body was numb and his foot was dragging due to the fall, but no medical care was provided for two months.

32.     On August 13, 2008, Lisa Lewis filed a notice of claim alleging that rectal/vaginal bleeding was ignored for 6 weeks.

33.     On August 13, 2008, Jetuan Epps filed a notice of claim alleging that the dentist in the WCJ left him with a broken tooth and exposed nerve for over 8 days.

34.     On September 18, 2008, Panagiotis Souris filed a notice of claim alleging that he suffered from seizures after a head injury, but no medical care was provided for two months.

35.     On October 10, 2008, Ayelen Rodriguez filed a notice of claim alleging that she was 3.5 months pregnant and bleeding profusely, but was denied medical care for several days, resulting in a miscarriage.

36.     On December 16, 2008, Anthony Dilworth suffered a slip and fall resulting in two cracked disks, a broken elbow and severe head injury. Medical care was expressly made contingent on him waiving all claims against Westchester County, its employees and agents. Mr. Dilworth was tortured, as that term is defined by federal law, for 281 days because he would not waive his legal claims. Mr. Dilworth and his wife personally informed the Commissioner of

DOC of Mr. Dilworth's conditions of confinement, but nothing changed even though the Associate Warden confirmed many of Mr. Dilworth's allegations.

37.     On December 29, 2008, James Bowen fell from the top of a bunk bed and suffered severe injuries to his head and back. He was beaten by a captain in the WCJ in an attempt to have him get up of his own accord. The Assistant Medical Director stood inches away as the beating occurred, but failed to provide medical care or intervene on Mr. Bowen's behalf.

38.     On December 29, 2008, Debra Sepulvado filed a notice of claim alleging that she suffered a slip and fall, was denied pain medication, no x-rays were taken and her crutches were arbitrarily confiscated, resulting in another slip and fall.

39.     On January 1, 2009, Charles Green filed a notice of claim alleging that his big toe was run over, he was transferred to the infirmary in the WCJ for 13 days, then transferred to the WCHCC Emergency Room where his big toe was amputated.

40.     On January 26, 2009, Deborah Palumbo filed a notice of claim alleging that she suffered a slip and fall resulting in blurry vision, back pain and wrist pain, but was denied medical care.

41.     On March 12, 2009, Richard Cleveland filed a notice of claim alleging that he was denied pain medication for a pre-existing condition which exacerbated his high blood pressure, resulting in his kidneys leaking protein into his blood.

42.     On March 30, 2009, Freddie Mercado filed a notice of claim alleging that he was prescribed eye drops by a nurse for severe ear wax and infection.

43.     On August 28, 2009, Danny Royster filed a notice of claim alleging that the Assistant Medical Director denied him medication for diabetes twice, resulting in him being hospitalized in ICU both times.

44. From September 2009 through October 2009, Jose Marrero suffered from increasing difficulty swallowing, to the point where he could not swallow any food or water. He repeatedly begged a nurse to allow him to see a doctor, but she ignored him as a correction officer repeatedly told Mr. Marrero to “go away” and that he would not receive medical care. Mr. Marrero was subsequently diagnosed with Stage IV esophageal cancer and expired a few months later. He left behind a blind widow and two year old son, which medical personnel knew of.

45. On February 7, 2010, Curtis Delano filed a notice of claim alleging that he was placed in a freezing cold cell after informing medical personnel that he suffered from seizures, he had a seizure, fell to the floor and was ignored by correction personnel, resulting in numbness on one side of his body and weakened grip in his hand.

46. On March 6, 2010, Candace Brown filed a notice of claim alleging that she was denied medication for congenital heart failure prescribed by her cardiologist, resulting in hospitalization for a weakened heart and implantation of a defibrillator.

47. On August 29, 2010, Terron Fleming filed a notice of claim alleging that he passed out in his cell, experienced sharp pain in his back and head, was coughing up blood and denied medical care.

48. On September 14, 2010, Damian Thomas filed a notice of claim alleging that he was shot with a shotgun and no medical care was provided to remove approximately 100 pellets in his arm for at least three months.

49. On September 19, 2010, Evans Brown filed a notice of claim alleging that he suffered a severely broken hand and was prescribed Percocet and Vicoden by the New York City Department of Correction, but denied pain medication by the WCJ.

50. On September 25, 2010, Dominick Lafurno filed a notice of claim alleging that he was denied medical care for kidney stones.

51. On October 4, 2010, Lamonte Riddenhour filed a federal claim alleging denial of medical care for over 5 weeks after a slip and fall in a shower in the WCJ. Subsequent x-rays revealed 3 breaks in his arm and 2 breaks in his hand.

52. Several other inmates also filed claims or actions regarding the denial of medical care while in the WCJ from 2008 through 2012.

**Allegations Regarding Negligent Supervision**

53. On information and belief, C.O. Michael Sheehan acted as a cameraman for the ERT during one response to a code. C.O. Sheehan captured the beating of an inmate on film and recorded several correction officers and supervisors yelling “turn the camera off” as he continued to record. As a result, fraudulent reports were filed, a second video was created and substituted for the original video, and fraudulent disciplinary charges were filed against C.O. Sheehan in retaliation for fulfilling his duties as cameraman.

54. On information and belief, two assistant wardens, R.M. and P.M., responsible for the safety and security of inmates were counseled for spending an exorbitant amount of time viewing pornography while on County time and with County property, from 2007 to 2008.

55. On information and belief, an assistant commissioner, J.G., responsible for safety and security of inmates was counseled for repeated use of a controlled substance, from 2008-2009.

56. On information and belief, Westchester County has failed to discipline several correction officers and supervisors for use of excessive force, denial of medical care and violation of inmates’ constitutional rights, or not intervening on inmates’ behalf, and has

promoted others despite having proof of said conduct. In short, Westchester County has engaged in willful blindness to the repeated misconduct of correction personnel. Some of the corrections personnel that were not disciplined include: C.O. Garrett (now Sgt.), C.O. Rogers (now Sgt.), Capt. Patrick, Assistant Warden O'Neill, Assistant Warden Turner and Associate Warden Lantz.

57. On information and belief, Westchester County has failed to discipline several correction officers and supervisors for active participation in or association with race based hate groups, as well as conduct and use of words that comport with race based hate groups' ideology, while on duty and with the use of Westchester County property, from at least 2006 through 2009, despite having knowledge or reason to know that such conduct existed. Some of the individuals that were not disciplined include Capt. Patrick, Sgt. Bizzarro, Sgt. Rogers, C.O. Bourhill, C.O. Santos, C.O. Quinoy, C.O. Poggi, C.O. Wyatt and C.O. Tejeda.

58. In 2006, Westchester County actually preferred charges against a former correction officer for refusing to engage in race based hate groups and discriminatory treatment of inmates based on race, and allowed him to be driven out of employment with DOC.

59. On information and belief, race based misconduct has continued through at least 2009, as evidenced by the verified Third Amended Complaint in *Dilworth v. Goldberg*, 10-cv-2224 (JMF) (GWG) (S.D.N.Y.), ¶ 146, which provides,

> While housed in A Block, Santos:
> E. Stated "Sit your black ass down"; and called Mr. Dilworth "nigger."
> F. On one occasion, Santos stated, "I got the word on you, Dilworth. I'm going to break you." Santos then lifted the sleeve of his uniform and revealed a tattoo on his shoulder to Mr. Dilworth. The tattoo depicted a single rope with three nooses. Each noose was wrapped around the neck of a baby, and each baby was shaded a different color – light, dark and medium. Santos described each baby as representing "Jews", "Niggers" and "Chinks." The depiction of the Asian baby included a coolie hat. Santos referred to the tattoo as "my code" and stated "This is what we do" as he simulated grabbing the rope with his hand and hanging the ethnicities represented by the babies.

G. Mr. Dilworth submitted a grievance regarding Santos' explanation of his tattoo, to a sergeant. Santos informed Mr. Dilworth that nothing would come of his grievance. Mr. Dilworth's grievance was never returned to him, and he was never informed of the result of it.
H. Mr. Dilworth spoke to another sergeant about Santos' explanation of his tattoo. The sergeant stated Santos has a right of expression and nothing could be done about it.

60. Westchester County purports to have a zero tolerance of racial discrimination. Mr. Dilworth's grievance should have been acted on immediately rather than ignored and explained away under the First Amendment. Said conduct is a reflection of the custom and practice in the WCJ of denying racial minorities equal treatment on the basis of their race.

61. At all times relevant, WCHCC had a custom and practice of forwarding to Westchester County all notice of claims and actions pertaining to medical care filed by inmates in the WCJ, and did not conduct any independent investigation into the allegations because it was fully indemnified for such claims by Westchester County. As such, WCHCC failed to supervise its employees and agents, and was deliberately indifferent to their claims.

**Allegations Specific to Mr. Nash**

62. On July 25, 2008, Mr. Nash was committed to the custody of the WCJ. During his intake screening plaintiff advised WCJ personnel that he had limited vision in his left eye due to a previous injury. Said information was entered into plaintiff's inmate and medical records.

63. Some time before September 1, 2008, plaintiff underwent surgery in his stomach. Plaintiff's surgeon advised him to eat plenty of oatmeal, porridge and soups at least four times a day, and drink 15 glasses of water per day, to help rebuild the lining of his stomach.

64. On September 1, 2008, plaintiff was involved in an altercation with another inmate. The ERT responded to plaintiff's cell. A member of the ERT injured plaintiff's left eye

by pushing it against a window in plaintiff's cell. Plaintiff was subsequently placed in the Special Housing Unit ("SHU") as a result of the incident.

      65.    On September 15, 2008, plaintiff was assaulted by C.O. Kressman. A video of the incident reveals the following:

i.   At approximately 12:56:00, plaintiff was preparing to meet his criminal defense attorney in the male search area.

ii.   At approximately 12:57:00, plaintiff was directed to remove two long sleeve undershirts by C.O. Kressman.

iii.   At approximately 12:57:04, plaintiff entered a changing stall and removed both undershirts.

iv.   At approximately 12:57:21, plaintiff handed C.O. Kressman one of his long sleeve undershirts by swinging it to him. The shirt never went above the height of C.O. Kressman's chin. At no time did the two individuals' hands come closer than approximately 2 feet. C.O. Kressman took the shirt in his right hand without incident.

v.   At approximately 12:57:27, plaintiff handed C.O. Kressman his second long sleeve undershirt by swinging it to him. The shirt never went above the height of C.O. Kressman's chest. At no time did the two individuals' hands come closer than approximately 2 feet. C.O. Kressman took the shirt in his right hand without incident.

vi.   At approximately 12:57:30, C.O. Kressman stepped up with his left foot into the entrance of the changing stall and had a verbal confrontation with plaintiff.

vii.   At approximately 12:57:33, C.O. Kressman delivered punches with his left hand into plaintiff's face and left eye.

viii.   At approximately 12:57:36, Sgt. Conway deployed Oleoresin Capsicum ("OC") into plaintiff's face, mouth and head immediately upon removing it from his person and orienting the canister in his hands. Sgt. Conway's deployment of OC exceeded one second. Sgt. Conway first deployed OC at a distance of approximately 3 feet and continued to deploy OC as he closed the distance between himself and plaintiff by entering the changing stall, even though plaintiff immediately succumbed to the effects of the OC and fell to the floor. Plaintiff and Sgt. Conway were the only two individuals in the changing stall at the time.

66.    On information and belief, the DOC Use of Force SOP in effect at the time of the incident prohibited anyone other than members of the ERT to carry or deploy chemical agents without authorization from higher authorities.

67.    On information and belief, Sgt. Conway was not trained to use chemical agents, or authorized to carry OC on his person and did not have authority to deploy chemical agents.

68.    ERT responded to the incident. The ERT has a custom and practice of not wearing any identifying information on the exterior of their equipment or uniforms. Their anonymity has assisted them in avoiding liability for use of excessive force on inmates.

69.    The New York State Department of Health, Bureau of Emergency Medical Services, Statewide Basic Life Support Adult & Pediatric Treatment Protocols, 2008, requires that eye contaminations be irrigated with saline solution or water for at least 20 minutes, as the injured party is instructed to blink frequently, and transportation to emergency medical personnel not be delayed.

70. New York State regulations governing adult jails require that corrections and medical personnel be trained in emergency medical procedures, including decontamination of eyes.

71. On information and belief, defendants Bell, Camera, Rennalls, Rogers, Simmons, Maccabee and Sussman were trained in emergency medical procedures, including injuries to eyes.

72. Plaintiff was subsequently taken to a shower and decontaminated with hot water for approximately 50 seconds by defendants Bell, Camera, Rennalls, Rogers, Simmons and/or Maccabee. The hot water intensified the pain and effects of the OC and caused further injury to plaintiff's eye. Plaintiff was unable to decontaminate himself fully due to the pain caused by the hot water, and combined effect of hot water and OC.

73. On information and belief, defendants Bell, Camera, Rennalls, Rogers, Simmons and Maccabee knew or should have known that cool water was required to decontaminate plaintiff's eyes.

74. Plaintiff was then brought to a medical station and decontaminated by N.P. Sussman for less than two minutes. N.P. Sussman asked if plaintiff could see her. Plaintiff replied he could only see her with his right eye, and he could not see out of his left eye. He was crying and obviously in severe distress as he continued to complain about his loss of vision. N.P. Sussman replied that "It'll get better," and cleared plaintiff medically for housing in the SHU.

75. Defendants Bell, Camera, Rennalls, Rogers, Simmons, Maccabee and Sussman knew that the duration of the intensity of the effects of the OC spray lasted for an exorbitant amount of time, but failed or refused to provide medical care to plaintiff.

76. Plaintiff was never transferred to certified emergency medical personnel for care to his left eye.

77. On September 15, 2012, C.O. Aldarando submitted a written report which provided, in part, "I saw [] [Kressman] order[ plaintiff] to take off his undershirt at which point using his undershirt [plaintiff] tried to hit [] Kressman's face."

78. On September 15, 2012, C.O. Gilmore submitted a written report which provided, in part, "I [] saw [] Kressman order[ plaintiff] to take off his undershirt at which point using his undershirt [plaintiff] tried to hit [] Kressman's face."

79. On September 15, 2012, Sgt. Conway submitted a written report which provided, in part, "Kressman ordered [plaintiff] to remove [his] shirt. [Plaintiff] removed the [] shirt and with his left hand threw the shirt directly into [] Kressman's face simultaneously punching [] Kressman's face, grazing his left side of his upper cheek. I gave [plaintiff] several direct orders to stop fighting and get down on his knee. [Plaintiff] refused to comply with my orders. I then deployed a one second burst of [OC]. At this point [] Kressman, officer Alderondo and myself had control of [plaintiff].

80. On September 15, 2012, Sgt. Conway also submitted an Oleoresin Capsicum Aerosol Report which falsely provided that he deployed OC at a distance of "4-6'" and plaintiff suffered "No" "Physical injury to inmate." Said report was part and parcel of, and in an effort to cover-up, the WCJ's custom and practice of failing to protect inmates from harm, as well as his own misconduct.

81. On September 15, 2012, C.O. Kressman submitted a written report which provided, in part, "At this time [plaintiff] removed the shirt throwing it into my face with his left hand and at the same time throwing a punch with his right hand striking my left side upper

cheek. At this time I attempted to restrain [plaintiff] by grabbing him around his upper body to stop his aggressive behavior. At this time Sgt. Conway applied OC agent."

82.     On September 15, 2012, Sgt. Maccabee submitted a report regarding ERT's response and interaction with plaintiff. The report falsely provides, "Detainee Nash was decontaminated for several minutes in the shower utilizing cool running water." Said report was part and parcel of, and in an effort to cover-up, the WCJ's custom and practice of failing to protect inmates from harm.

83.     The above referenced reports of defendants Aldarando , Gilmore, Conway, Kressman and Maccabee are pure fabrications, and part and parcel of Westchester County's custom and practice of failing to protect inmates from harm.

84.     While in the SHU plaintiff submitted several sick call complaints regarding denial of medical care for his injured eye, failing vision in his other eye, denial of food consistent with his religious beliefs (halal meals), food fit for human consumption, clean drinking water and food to meet his medical needs.

85.     On August 11, 2008, plaintiff was seen by a nurse in the WCJ who noted "decreased vision," "cannot see chart" and "gets ocular strain."

86.     On August 12, 2008, defendant Bailey-Wallace made the following notes in plaintiff's medical chart, "No sense / how long ago trauma occurred, further information required before consideration for referral." The nurse ordered a consultation with an eye specialist.

87.     On August 15, 2008, plaintiff was seen by a nurse in the WCJ who mischaracterized the nature of plaintiff's complaints pertaining to his eyesight, as a simple request for eyeglasses and described his medical history of eye trauma.

88.     On September 17, 2008, defendant Bailey-Wallace made the following entry in plaintiff's medical record, "P[atien]t states he cannot open his eye due to the effects of 'pepper spray.' Adequate eye exam not possible. P[atien]t will be rescheduled at a later date." The entry was reviewed and counter signed by Dr. Bailey-Wallace.

89.     On October 29, 2008, plaintiff was seen by Dr. Kaskawits, who made the following entry in plaintiff's medical record, "Cannot open eye. Cannot do adequate exam due to patient discomfort. Recommend ophthalmology referral for further evaluation."

90.     On October 29, 2008, Dr. Bailey-Wallace reviewed Dr. Kaskawits' entry and made the following counter entry, "P[atien]t will be evaluated by [] Staff – unclear why he could not open his eye for evaluation by optometrist on site. This is not a reason for referral to ophthalmologist."

91.     Dr. Bailey-Wallace is responsible for approving all medical referrals to specialists. Dr. Bailey-Wallace refused to schedule plaintiff for an appointment with an ophthalmologist, despite knowing plaintiff could not see out of his left eye and could not open his left eye without severe pain more than one month after the incident. Defendant Bailey-Wallace's justification for denying the referral to an ophthalmologist was dilatory and part and parcel of the WCJ's custom and practice of failing to protect inmates from harm.

92.     Plaintiff was prevented from exhausting his administrative remedies while in the SHU; grievance forms were not available and not provided.

93.     Plaintiff was sentenced to the SHU for 365 days as a result of the fraudulent reports of defendants Aldarando, Gilmore, Conway and Kressman. While in the SHU plaintiff was denied access to the law library, and had difficulty in trying to do his legal work due to the loss of vision in his left eye. He also began to experience difficulty seeing out of his right eye.

94.     Plaintiff's appeal of his sentence for 365 days confinement to the SHU was denied.

95.     On information and belief, the hearing officer that rendered the sentence and the assistant warden that denied the appeal knew or should have known of the existence of the surveillance video in the male search area, but refused to request, consider or review said video as part and parcel of, and in an effort to cover-up, the WCJ's custom and practice of failing to protect inmates from harm.

96.     On December 5, 2008, defendant Yozzo sent an e-mail to Assistant Warden Doty regarding the provision of medical care to plaintiff. Yozzo described the history of plaintiff's inability to open his left eye as "not cooperating in the [eye] examination process." Yozzo failed or refused to intervene on plaintiff's behalf and facilitate additional examinations of plaintiff's left eye by qualified medical personnel, even though she had the ability and authority to do so. Yozzo also wrote that plaintiff's "visual decline bilaterally obviously has not affected his capability to perform activities of daily living [] by reading the letter he wrote to Governor Patterson on lined paper which is properly aligned."

97.     On about December 5, 2008, Assistant Warden Doty wrote a report on the investigation he did into the incident between plaintiff and C.O. Kressman, in response to a request from the New York State Commission of Correction ("COC"). Warden Doty failed to identify or reference the video of the incident taken in the male search area from the mounted surveillance camera in that area. Even a cursory review of the video would have established that the reports of defendants Aldarando, Gilmore, Conway and Kressman are pure fabrications, and would have verified the times and allegations in ¶ 64, *supra*.

98. On information and belief, Warden Doty knew or should have known of the existence of the surveillance video in the male search area, but refused to report its existence or describe its contents as part and parcel of, and in an effort to cover-up, the WCJ's custom and practice of failing to protect inmates from harm.

99. Warden Doty's report was submitted to Deputy Commissioner Kevin Cheverko.

100. On belief, Cheverko forwarded Doty's report to COC as written. Cheverko knew or should have known of the existence of the surveillance video in the male search area, but refused to request, consider or review said video as part and parcel of, and in an effort to cover-up, the WCJ's custom and practice of failing to protect inmates from harm.

101. On about December 15, 2008, plaintiff served a notice of claim on Westchester County; the 91st day after the September 15, 2012 incident.

102. On December 31, 2008, plaintiff's booking folder, medical records, video from the male search area and ERT video were forwarded to the Westchester County Attorney's Office for review.

103. On about July 22, 2009, defendants Martinez and Brugger subsequently retaliated against plaintiff for attempting to pursue his legal claims by confiscating and destroying his legal papers, which prevented him from filing an application to file a late notice of claim and prevented him from filing a federal action while in the WCJ.

104. As a result of plaintiff's illegal confinement in the SHU for 365 days and confiscation and destruction of his legal documents, plaintiff was denied access to state courts to seek redress for his injuries.

105. Plaintiff was subsequently transferred to the custody of the New York State Department of Corrections ("NYDOC"). While in custody of NYDOC plaintiff filed the instant action, *pro se*.

**DAMAGES**

106. As a direct and proximate result of the defendants' misconduct plaintiff suffered the following damages:

A. Violation of his rights pursuant to the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the U.S. Constitution;

B. Conscious, needless pain and suffering;

C. Severe emotional trauma and distress;

D. Failing vision in his right eye; and

E. Complete loss of vision in his left eye.

107. All the acts and omissions committed by the defendants described herein for which liability is claimed were done intentionally, unlawfully, wantonly, recklessly, or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

**COUNT I**
**§ 1983 *Monell* Claims**

108. Plaintiff hereby incorporates and references all of the foregoing paragraphs and further alleges as follows.

109. Defendants Westchester County and Westchester County Health Care Corporation condoned or permitted a custom and practice of denying inmates medical care for serious medical needs and/or a custom and practice of deliberate indifference to their medical care, generally.

110. Defendant Westchester County condoned or permitted a custom and practice of

use of excessive force on inmates in the WCJ.

111. Defendant Westchester County condoned or permitted a custom and practice of racial discrimination against inmates in the WCJ.

112. Defendant Westchester County failed to supervise its corrections personnel to such an extent that it exhibits a deliberate indifference to the conditions of confinement of inmates in custody of the Westchester County Jail, and allowed an atmosphere in which corrections and medical personnel believed they could act with impunity and never be subjected to any form of discipline for violation of the rights of inmates, no matter how egregious their conduct.

113. As a result, plaintiff suffered the injuries described above.

**COUNT II**
**§ 1983 Claim for Use of Excessive Force in Violation of the Fourth, Eighth and Fourteenth Amendments**

114. Plaintiff hereby incorporates and references all of the foregoing paragraphs and further alleges as follows.

115. C.O. Kressman and Sgt. Conway’s use of force on plaintiff was effected by without authority of law and without any reasonable necessity to use any force, much less the excessive force that they employed, and the force employed was used without legal justification, without plaintiff's consent, with malice, sadistic intent and with an intent to inflict pain and suffering.

116. As a result, plaintiff suffered the injuries described above.

**COUNT III**
**§ 1983 Claim for Deliberate Indifference to Serious Medical Needs in Violation of the Fourth, Eighth and Fourteenth Amendments**

117. Plaintiff hereby incorporates and references all of the foregoing paragraphs and

further alleges as follows.

118. As described above, defendants Bell, Camera, Rennalls, Rogers, Simmons, Maccabee and Sussman acted with deliberate indifference to plaintiff's serious medical needs, by among other things, decontaminating plaintiff for significantly less time than provided for by New York state emergency medical protocol, decontaminating plaintiff's eyes with hot water which intensified and prolonged the effects of the OC spray, clearing plaintiff medically for and confinement in the Special Housing Unit despite knowing that plaintiff was unable to see with his left eye, not providing medical care by qualified medical personnel for injuries to his left eye.

119. As described above, defendant Bailey-Wallace acted with deliberate indifference to plaintiff's serious medical needs, by among other things, denying access to qualified medical personnel for care of his left eye, ignoring the possibility that OC did in fact injure plaintiff's left eye and recklessly or intentionally failing to document the true status of plaintiff's ability to cooperate with qualified medical personnel in the provision of medical care to justify the denial of medical care.

120. As described above, defendant Yozzo acted with deliberate indifference to plaintiff's serious medical needs, by among other things, ignoring plaintiff's complaints of blindness in his left eye and not intervening on his behalf by providing access to qualified medical specialists.

121. As a result, plaintiff suffered the injuries described above.

**COUNT IV**
**§ 1983 Claim for Denial of Access to the Courts in Violation of the First Amendment**

122. Plaintiff hereby incorporates and references all of the foregoing paragraphs and further alleges as follows.

123. As described above, defendants Martinez and Brugger retaliated against plaintiff because he was attempting to pursue legal claims against various defendants for use of excessive force and denial of medical care, by confiscating and destroying his legal papers. Said conduct resulted in denial of access to state court for redress of injuries sustained by use of excessive force and denial of medical care for injuries to his left eye.

124. As a result, plaintiff suffered the injuries described above.

**COUNT V**
**§ 1983 Claim for Interference with Exercise of Religion in Violation of the First Amendment**

125. Plaintiff hereby incorporates and references all of the foregoing paragraphs and further alleges as follows.

126. As described above, Westchester County imposed obstacles that significantly interfered with plaintiff's ability to exercise his religion, specifically plaintiff was denied food in accordance with his religious beliefs, halal meals.

127. As a result, plaintiff suffered the injuries described above.

**COUNT VI**
**§ 1983 Claim for Wrongful Excessive Confinement in Violation of the Fifth and Fourteenth Amendments**

128. Plaintiff hereby incorporates and references all of the foregoing paragraphs and further alleges as follows.

129. As described above, defendants Cheverko, Doty, Aldarando, Gilmore, Conway and Kressman wrote fraudulent reports regarding the incident of September 15, 2012, and/or failed to intervene in the face of fraudulent reports. Said reports provided the basis for administrative charges against plaintiff, and subsequent wrongful segregation in the Special Housing Unit for 365 days. Plaintiff was aware of said segregation, which was against his will.

130. As a result, plaintiff suffered the injuries described above.

**COUNT VII**
**§1983 Claim for Race Motivated Denial of Medical Treatment and Unconstitutional Conditions of Confinement**

131. Plaintiffs hereby incorporate and reference all of the foregoing paragraphs and further allege as follows.

132. As described above, defendants Bell, Camera, Rennalls, Rogers, Simmons, Maccabee Sussman, Aldarando, Gilmore, Conway, Kressman, Martinez, Brugger and Bailey-Wallace selectively treated plaintiff on the basis of his race when compared with other inmates similarly situated.

133. As a result, plaintiff suffered the injuries described above.

WHEREFORE, plaintiff requests the following relief:

A. Declaratory judgment that plaintiff's rights under the First, Fourth, Eighth and/or Fourteenth Amendments to the U.S. Constitution were violated;

B. Declaratory judgment that defendants Aldarando, Gilmore, Conway, Kressman and Maccabee are not credible as a matter of law;

C. Injunctive relief ordering all members of the Westchester County Emergency Response Team to display their names or badge numbers on the front of their protective gear, just as all uniformed corrections personnel do on their uniforms;

D. Presumed damages as the jury may determine;

E. Compensatory damages as the jury may determine, but no less than $3,000,000;

F. Punitive damages as the jury may determine, but no less than $3,000,000;

G. Award of attorney's fees, costs, and disbursements;

H. Such other and further relief as to the Court seems just and proper.

Dated: October 30, 2012
Ossining, New York

_/s Michael A. Deem____________
Michael A. Deem (MD8158)
Attorney for Plaintiff
95 Croton Avenue, Suite 37-T
Ossining, NY 10562
(914) 502-0395